MARTIN *v.* VEANA FOOD CO.

1. FRAUD — MISREPRESENTATIONS — EXPRESSIONS OF OPINION — INDUCING PURCHASE OF STOCK.

> Representations by the officers of a limited partnership association, to induce the purchase of stock, that there was a constantly increasing demand for the product of the association's factory, that it had a plant costing about $100,000, that the experimental stage had long since been passed and the basis of assured success well laid, and that the output of the factory was over 1,000 pounds of product per hour, which would show a profit of 35 per cent. on the investment, were not mere expressions of opinion, but were statements of fact, for which, being false, an action lies.[1]

2. SAME—LIABILITY.

> Though one may, without legal liability for results, permit another, for a consideration, to share his hopes, however adroitly the statement of his hopes may be phrased, he may not

----

[1] As to expression of opinion as fraud, including question what constitutes expression of opinion. see note to *Hedin* v. *Minneapolis Medical, etc., Institute* (Minn.), 35 L. R. A. 417.

by actual misstatement, without liability, induce the belief that the venture is without other risk than the usual risk of an established and prosperous business.

3. SAME—EVIDENCE—ADMISSIBILITY.

    In an action for fraud in inducing plaintiff to purchase shares in a limited partnership association as a part of the consideration for his appointment as district manager under a contract contemplating his sale of 300 cases of goods per month, evidence was admissible tending to show that it was impossible or unlikely that a manager could sell the amount specified.

Error to Eaton; Smith, J.    Submitted May 7, 1908. (Docket No. 108.)    Decided June 27, 1908.

Case by Louis H. Martin against the Veana Food Company, Limited, and others, for fraud and deceit.    There was judgment for defendants on a verdict directed by the court, and plaintiff brings error.    Reversed.

*Stewart & Sabin*, for appellant.

*Garry C. Fox* (*Moore & Moore*, of counsel), for appellees.

OSTRANDER, J.    Plaintiff, on September 30, 1904, purchased from defendant association, at par, and paid for, $1,000 of its capital stock.    Later, in December of the same year, he asked the association to take his stock and repay him his money.    This it did not do.    His action is for damages for fraud and deceit.    At the trial, plaintiff having closed his case, the court directed a verdict for defendants and judgment was entered on the verdict.    The errors assigned make it necessary to determine whether, upon that view of the testimony, admitted or wrongly rejected, most favorable to plaintiff, there were questions which should have been submitted to the jury.    The defendant association was organized March 10, 1902, with a capital of $500,000, in shares of one dollar each.    Ten thousand dollars in cash was paid in by ten men, each of whom received $25,000 of stock.    Of the $350,000 of stock

represented as paid, the remainder was first given, or paid, for a formula for making flaked goods. Of this, 68,000 shares, and perhaps a greater number, were afterwards turned in to the treasury. Various persons purchased stock at from 10 to 25 cents a share to the amount of $9,925. A factory was built at an expense of $47,000, money for this purpose being borrowed as was necessary. Manufacture of food was begun in May or June, 1903. On September 1, 1904, the association was overdrawn at the bank $10,820.71, and had a total indebtedness apparently of more than $34,000. Sales of stock were made, at par, to persons appointed district managers, to the amount of $51,325. Plaintiff's connection with the association is best shown, though at the expense of considerable space, by the following recital and by documents, copies of which are given. He was employed at Aurora, Illinois, when he read in the Scientific American, in its issue of September 3, 1904, the following advertisement:

"Reliable man wanted. A prominent cereal food company will contract with thoroughly reliable man for two years at $150 a month, together with commission and office expenses. Highest references required. Address, 'Auditor, Box 475, Bellevue, Mich.'"

Plaintiff wrote to the address and in reply received a letter from defendant company, inclosing a prospectus. The following is the letter:

"J. R. Hall, Chairman,    T. E. Robinson, Secretary
"F. M. Mulvaney, Treasurer.        and Gen'l Man'gr.
        "THE VEANA FOOD CO., LTD.
    "Manufacturers of Veana Flaked Cereal Food.

                "BELLEVUE, MICH., Sept. 13, 1904.
"L. H. MARTIN, Aurora, Ill.
    "*Dear Sir:* Your valued favor of recent date in reply to our advertisement has been received and filed; replying to same, we will endeavor to give you a brief, yet intelligent, idea of the situation, and then if interested we will take the matter up with you in detail. We are engaged in the manufacture of 'Veana Flakes,'—undoubtedly the acme of perfection in the cereal food line; there is a constantly increasing demand for our product, and in

order to afford better facilities for the handling of our goods we have decided to open several branch offices or distributing depots, and are now in search of competent men to take charge of same. We have recently adopted the co-operative system of doing business, and believe that our best employés, who hold responsible positions with us, should participate in the profits they help to make.

"Our company is incorporated under the laws of the State of Michigan with an authorized capital of $500,000. At a recent meeting of the board it was decided to set aside $100,000 worth of stock, which is to be offered until Jan. 1, 1905, to our branch office managers in blocks of from 1,000 to 5,000 at par one dollar per share, which must be paid for in cash at the time of closing contract; we do this for the reason that our experience and that of other well-known concerns has proven beyond doubt that when a man has a financial interest in the company he represents, he puts forth a much better effort than were he merely an employé; therefore, in order to secure the best possible results from our branch office managers we deem it imperative that our trusted employés be financially interested with us.

"Our proposition is not made through philanthropic motives, but is based upon purely business principles, and we court from those who are in a position to meet the requirements the closest investigation.

"To put the entire proposition to you in a nutshell, we want as branch office managers men of ability to interest themselves with us financially, morally, and commercially, with a view of producing by concentrated effort the best results possible. The minimum investment that can be made by our branch office managers with us is $1,000 and the maximum $5,000, and with men of whom we approve we are prepared to close a two years' contract at a salary of $1,800 per annum payable monthly, and ten per cent. commission on the business done through his territory except the first 300 cases per month, also fifty cents per case on all goods sold by his individual efforts, so that a hustler ought easily to make $5,000 per year. In addition he will receive the dividends accruing to his stock, which is fully paid and non-assessable; we will rent and furnish at our own expense, office quarters and warehouse facilities. We are thoroughly established, have a plant which stands alone in its class, both from architectural and mechanical engineering standpoints, which has cost about $100,000, will produce daily 600 cases of better food at a lower price

and consequently at a higher profit, than any factory yet built. Our entire proposition is co-operative, it being, as we have stated before, our firm belief that concentrated effort will bring results obtainable in no other way.

"The duties of a manager will be to secure, employ, and superintend a force of local and traveling salesmen to cover the territory which we assign him; in short, he is to have general control of, and supervision over, the business of his department, and to handle same as though it were his own; if a man has managerial ability and will follow our instructions he can readily adapt himself to our business. The credits and collections will all be handled from the home office so that a man can give his undivided attention to the sale of our goods.

"If you are interested from what we have told you of our proposition, you can secure from either Dun or Bradstreet our rating, also the very best banking references and other evidence of our standing, and we shall expect equally as good references from the man who wishes to take up and expects to fill so important a position as that of branch office manager of this company. If you feel that you are in a position to meet with all the requirements as outlined, and would like to go into the matter in full detail, write us—but do not simply ask for details—make your questions specific and right to the point.

"We shall also be pleased to hear from you at an early date, giving us your references and a brief statement relative to your experience, in order that we may ascertain if you are the man we are looking for.

"Hoping that we may be favored with a prompt reply, we beg to remain,

"Yours respectfully,
"THE VEANA FOOD CO., Limited,
"T. E. ROBINSON."

The prospectus:

"THE VEANA FOOD COMPANY, LIMITED,
"Capital Stock, $500,000.
"Bellevue, Michigan.
"Officers.
" *Chairman*, J. R. Hall,
"*Treasurer*, F. M. Mulvaney,
"*Secretary and General Manager*, T. E. Robinson.

"PROSPECTUS.

"The Veana Food Company, Limited, having profited

by the experience of all other large food plants, has today the finest and best equipped food plant in Michigan, if not in the world; not the largest or most elaborate, but the most complete; in fact, a *perfect* plant.  While most of the food companies handle their product in a very crude and expensive manner, the Veana Food Company will not lay a hand on its product from the time it enters the hoppers until it comes out in cartons.  Nothing has been left out and no modern idea overlooked.

"Unless one has given thought and attention to the cereal food business, the rapid growth and fortunes that have been made in it read more like some tale of enchantment from Arabian Nights.  A volume could be written on the subject, but we cite only two instances: one manufacturer began seven years ago in a barn in Battle Creek, with scarcely a dollar of capital—in fact, had to borrow money for the purpose, and his advertising was done on credit; now he is a multimillionaire and the sales of his factory in 1902 were over $4,000,000, after spending $600,000 in advertising.  Two years ago the stock of another company went begging at 17 cents on the dollar—it is now worth twelve and one-half times par value, and the company is incorporated for several millions.  It might be well to state right here that the remarkable growth of Battle Creek during the past two years is directly attributed to these two food companies, —over two thousand houses having been built in a single year.

"After careful investigation of the co-operative system now in use by the Carnegie Steel Co., the National Cash Register Co., Proctor & Gamble, Sir Thomas Lipton (the world's greatest tea merchant), et al., it has been found that the phenomenal success of these well-known concerns was attributed largely to co-operation, and clearly demonstrated the merit of the system; therefore on June 1, 1903, the Veana Food Co., Ltd., decided to adopt the co-operative system, and there can be no question but that by giving their branch office managers an active and financial interest in the business, it will undoubtedly distance all competitors in a very short time, and secure results not obtainable by any other means.  Not only is it gathering about itself a small army of gallant workers who stand shoulder to shoulder, all working together for the good of the whole, but it has made it possible for them quickly and radically to better their own fortunes.

Should any one of our branch office managers start in business for himself with a capital of $1,000 or even $5,000 he would cut little figure in these days of competition— we do not care what line he selected, nor in what town he located; but by joining hands with us, he not only has the advantage of many thousand dollars, but of the full-fledged factory besides.

"The food situation of today is past the speculative stage, it having proven itself the best investment of the day. The truth of the statement can be easily verified by consulting the mercantile agencies in regard to food investments during the past three years.

"In order to appreciate the value of our earning capacity, it should be remembered that we have an output of over 1,000 pounds an hour of chemically pure food, which will show a net profit of thirty-five per cent. on the investment. The success of this company is not a matter of speculation, for two very important reasons: *First*, this is a cereal food age in which the public with increasing discrimination demands cereal foods, selects and continues to use that which is best, and to make rich the men who manufacture and market it. *Second*, the men at the head of this company thoroughly understand this business in every detail; having demonstrated that it can and does produce an article of superior merit; in fact, the experimental stage has long since been passed and the basis of assured success well laid.

"In addition to our food plant we have installed a 3,000 light generator for the purpose of furnishing light and power for Bellevue, the company having already secured a five-year contract and thirty-year franchise. The electric light plant will be operated without any additional cost of labor, as the same engineer corps will run both plants. This is of tremendous import to the average stockholder or prospective investor in the Veana Food Co. The lighting plant will not only increase the company's revenues but will vastly help to make it independent.

"It is the purpose of this company to establish one branch office in each State in the Union for the sale and distributing of Veana Flake Food; placing in charge of same men of sterling integrity and business ability. We are in need of good, reliable men, and those who can properly qualify need never look further for employment."

Plaintiff visited Bellevue, went over the plant of the

company, and, as has been stated, he purchased 1,000 shares of stock and entered into the contract indicated by the correspondence. The testimony tends to prove that defendant Robinson said the business was in a prosperous condition; that some of the agents were very successful and others not as successful; that there had been invested in the business from $100,000 to $125,000; that the business was successful and was paying about 30 per cent. Nothing was said about the indebtedness of the company, and no inquiry made concerning it. The testimony further tends to prove that whatever hopes may have been entertained by the promoters of this association, it was not, when plaintiff purchased his stock, conducting a successful business, was not prosperous, was not solvent. The product it manufactured was without any considerable reputation in a market where competition was swift and sharp, and, except that it was an organized concern with a plant for manufacturing a flaked food and had to some extent, by advertising and in other ways, exploited its business, it had nothing to offer to any purchaser of its stock except a place in an adventure, the history of which was not, especially in the absence of large sums available for advertising, prophetic of final success. It did, in fact, fail of success.

It must have been expected that plaintiff would rely upon the representations, *first*, that there was a constantly increasing demand for the product; *second*, that there was a plant which had cost about $100,000; *third*, that the experimental stage had long since been passed and the basis of assured success well laid; *fourth*, that—

"In order to appreciate the value of our earning capacity it should be remembered that we have an output of over 1,000 pounds an hour of chemically pure food, which will show a net profit of thirty-five per cent. on the investment."

These are not mere expressions of opinion and do not relate to immaterial matters. When these printed repre-

sentations were followed by the express oral statements of officers of the company to the effect already stated, it cannot be said that the plaintiff and the defendants were dealing on even terms, that deceit, with or without malice, was not practiced to the injury of plaintiff.

The testimony of the secretary and general manager is:

" We felt the need of money at that time; we were like most anybody, we need money all the time. April 30, 1903, at the time of this meeting [when the plan was authorized], was before we began to manufacture our product; that was just when we were finishing our mill. We found ourselves in need of money and an output of our product."

At different times, some 50 agents or district managers were appointed after purchasing stock. Some of them had contracts requiring them to sell no more than 200 cases each month and it appears that failure to sell this amount did not in every case deprive the manager of his salary. The same witness further testified concerning his interview with plaintiff, which, as we have seen, was in 1904:

"And I told him we had a good plant, we had a good food; that we were working most of the time; that some of our managers were good and some were not so good; that we did not want any dead ones, that we wanted live ones, and for the man that was a live one we had a good proposition; and told him that the territory, in order to make the office pay expenses in good shape, should furnish 300 cases a month; and I told him that he or anyone else that didn't think they could sell that, that we didn't want them; that we had had some that had fallen down and weren't any good; and I marked out to him on a paper there how he could—what the sale of 300 cases would mean, $150 a month and his commission would start on over and above the 300 cases and 50 cents per case on his own individual efforts. That was about the limit of the conversation that I had with him. Mr. Hall was there and he was in his company a good share of the time after that."

Coupled with the statement that the business was prosperous, this was a direct representation that a good man-

ager ought to secure sales of 300 cases per month, and more. It was both an inducement to buy stock and a representation of its value. Undoubtedly, one manager of the sales of goods will excel another manager in the same territory, but at this time (1904) the defendant company and its officers had had an experience of more than a year in the sale of their product and had employed various managers in various States. The same witness testified:

" The first year we were at it we did very little; we went at it in a very mild way, and then the next year the market was flooded with so many kinds of foods and the quality was such that complaints came in from our customers and the like of that that the stuff was not moving, and I should say that was in 1904, some time, the summer and fall, perhaps. Very soon after we started we found there was competition and very strong. We finally found it became very fierce. The competition was quite strong. The demand fell off some and shortened up in the winter months of 1903 and 1904, and then again in the fall of 1904 and 1905. It wasn't pleasant, lots of it. We were selling some, but not a great deal. We figured out a profit in the goods provided we could sell them."

Plaintiff was not given an opportunity to try to sell the goods before investing in the stock. If, therefore, in the experience of the company no manager had ever been able to sell 300 cases of the food per month, the offer made to plaintiff to sell him the stock at par upon such conditions, coupled with the statements of the general manager, and the representations of the prospectus, was a misrepresentation. The argument that defendants had the right to enter into such contracts with agents as it, and they, pleased, that if plaintiff and other managers had performed their contracts the salaries could have been paid and the stock would have been valuable, that in the absence of actual bad faith defendants should be held innocent, is not convincing. There is testimony tending strongly to prove the honest belief of defendants in the ultimate success of the enterprise. Undoubtedly, one may, without legal liability for results, permit another,

for a consideration, to share his hopes, however adroitly the statement of his hopes may be phrased. He may not, by actual misstatement and without liability, induce the belief that the venture is without other risk than the usual risk of an established and prosperous business. The claim of plaintiff is that defendants represented as actual that which they hoped might become actual; that he paid his money, relying upon the representations. We are of opinion that it cannot be said, as matter of law, that plaintiff is entitled to no relief.

What has been said disposes of most of the alleged errors. Under the circumstances, plaintiff should be permitted to show, if he can, that it was impossible or unlikely that a manager could perform his contract to sell 300 cases of the food each month. Other questions presented are not likely to arise upon a new trial.

The judgment is reversed, and a new trial granted.

HOOKER, MOORE, CARPENTER, and McALVAY, JJ., concurred.