Thomas K. CONNELLAN, Plaintiff,

v.

Paul E. HIMELHOCH, Defendant and Third-Party Plaintiff,

v.

Dr. Chauncey SMITH, Third Party Defendant.

No. 79–72858.

United States District Court, E. D. Michigan, S. D.

Jan. 30, 1981.

Donald F. Tucker, Southfield, Mich., for plaintiff.

Alan A. May, Detroit, Mich., for defendant and third-party plaintiff.

Karl Reibel, Troy, Mich., for third-party defendant.

## OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This case emanates from the plaintiff's financially disastrous participation in a short-lived corporation; the National Institute of Behavior Change (NIBC). The complaint of plaintiff, Thomas K. Connellan, which was filed July 20, 1979, alleged that he was induced by the misleading representations of defendant Paul E. Himelhoch to

become a shareholder in the NIBC. After the Institute had operated unsuccessfully for less than three months, the corporation was dissolved and plaintiff's investment was lost. Mr. Connellan's three-count complaint alleged defendant Himelhoch's violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. and regulations thereunder, violations of the Michigan Blue-Sky Laws, and common law fraud. Jurisdiction of this matter is found by the court to be properly based upon Section 27 of the Securities Exchange Act of 1934 [15 U.S.C. § 78aa] and the doctrine of pendent jurisdiction. Defendant Himelhoch, thereafter filed a third party complaint against Dr. Chauncey Smith, alleging that Himelhoch's participation in NIBC was caused by numerous misrepresentations made by Smith.

On September 9, 1980, after four days of trial and at the close of plaintiff's proofs, the court entertained motions to dismiss which were made by defendant Himelhoch and third-party defendant Smith pursuant to Federal Rule of Civil Procedure 41(b). After considering the evidence adduced by plaintiff, the motions were granted. However, because none of the parties addressed their arguments on the motions to the questions of Himelhoch's failure to register the NIBC transaction under the Michigan Blue-Sky Laws, on September 20, 1980, the court asked counsel to submit written briefs on the issue. After again reviewing the parties' briefs as well as the record of plaintiff's case, the court finds that upon the facts and the law plaintiff has failed to demonstrate a right to relief under any of the theories which he advanced. Consequently, it is ordered that plaintiff's complaint be and it hereby is dismissed, for the reasons stated below.

NIBC corporation was originally formed by Paul Himelhoch along with two psychologists: Dr. James V. McConnell and third-party defendant, Dr. Chauncey Smith. Each of these three individuals were issued two thousand shares of corporate stock. Envisioned by its original shareholders as a vehicle to provide therapeutic clinical treatment for human weight reduction in the metropolitan Detroit area, NIBC was an outgrowth of a treatment and research program which Smith and McConnell were operating successfully in Ann Arbor, Michigan. Defendant Himelhoch's wife had participated in the Ann Arbor program, and she served as a catalyst for bringing Himelhoch, Smith and McConnell together. The three shareholders met informally on a number of occasions, but except for the standard corporate documents did not reduce their agreement regarding the clinic's operation to writing. Dr. Smith testified, however, that defendant Himelhoch had represented himself to him as a CPA with experience in developing small organizations. It was agreed, therefore, that he would handle the fiscal administration and management of the new corporation. The defendant had also indicated orally to Dr. Smith that he could capitalize the new venture up to $25,000.00.

By December, 1976, the Articles of Incorporation for NIBC had been filed, an office for the clinic had been rented in Birmingham, Michigan, and defendant Himelhoch had expended funds for a radio advertising campaign. However, Dr. Smith testified that he and Dr. McConnell no longer wanted to continue the business venture with Himelhoch because of differences in their managerial styles and the undue haste with which they believed defendant was proceeding. Shortly after Christmas, Smith and McConnell jointly mailed an undated letter to Himelhoch which stated in part: "It is our opinion that we cannot work with you effectively, now or at any time in the future, and that should the corporation remain with its present structure, it will fail both in terms of our relations with each other and our goal of providing high-quality services to the public." In the letter, McConnell and Smith demanded that all corporate assets be frozen and proposed a buy-sell option for the corporate stock. After reviewing the letter, defendant Himelhoch telephoned Smith and proposed that the two of them continue the project without McConnell. However, Smith testified that he was unwilling to participate in NIBC unless a third party tie-breaker could be found.

Later in December, 1976, McConnell and Smith met with the plaintiff at his home to discuss the possibility of Connellan's association with NIBC. Smith and Connellan had become acquainted years earlier while plaintiff was working on his Masters Degree in Business Administration at the University of Michigan. Smith testified that he thought the plaintiff might prove to be a good tie-breaker participant, based upon his observations of Connellan as a successful management consultant to business organizations over a course of years. In addition to his MBA, Connellan holds a Bachelor's Degree in Business Administration and a Ph.D. from the University of Michigan School of Education. He is also the author of at least three published books: *The Brontosaurus Principle: A Manual For Corporate Survival; How to Improve Human Performance*; and *How to Make Self-Starters*. Both Smith and Connellan confirmed that plaintiff was told of the serious dissatisfaction which McConnell and Smith had experienced with Himelhoch. Thus, fully briefed, Connellan testified that he found the proposition intriguing and that he agreed to meet with the defendant in order to further explore the matter of replacing McConnell in the corporation and becoming the "tie-breaker."

The first meeting between Mr. Connellan and defendant took place without either McConnell or Smith at a real estate office in Southfield, Michigan. The plaintiff testified that he questioned Himelhoch regarding his understanding that defendant would be funding the venture. In reply, Himelhoch suggested that he and Connellan divide the start-up costs fifty-fifty. Connellan indicated that he did not have cash available to fund the project, but agreed with defendant's second proposal that they split the costs of a loan and use the proceeds to furnish the offices. Connellan testified that the defendant stated he would fund the business' operating deficits, although Himelhoch gave no indication as to how much money he had available, nor the projected time frame of his commitment. Significantly, Mr. Himelhoch asked the plaintiff how much he estimated the start-up costs would be. Mr. Himelhoch also showed the plaintiff a schedule of projected income and expenses for the first weeks of NIBC's operation. Mr. Connellan did not question the defendant as to the source or reasonableness of his figures, but stated he took them at face value.

Within a few days of their first meeting, Himelhoch mailed the plaintiff a documents entitled "National Institute of Behavior Change Estimate of First Three Months Income and Expenses." This document contained basically the same set of figures which defendant had shown Connellan at their initial meeting and was accompanied by an undated handwritten letter from the defendant to Connellan. The letter states in part: "As you requested, enclosed is a fast workup on Income and Expenses— There are many possible variables which can alter the figures—both to the good and the bad!". The last paragraph of the defendant's letter reads, "I will bring with me figures on the cost of setting up the clinic as new ones are coming in every day. Ball park figures without advertising still come to between 10–15 M." An examination of the defendant's Estimate of Income and Expenses shows that Himelhoch listed estimated monthly office expenses at $3,620.00 for the first three months of operation. Based upon a constant monthly geometric increase of patient hours for therapy and diagnostic evaluation, defendant projected $7,500.00 gross income during the first month, $14,700.00 for the second and gross income of $21,900.00 the third month of the clinic's operation. Consequently, defendant's estimate reveals projected net returns of $3,880.00, $11,080.00, and $18,280.00 respectively for the first three months of operation. Mr. Connellan testified that the demands of his management consulting business prevented him from checking into either the defendant's background or the figures which he had been given. Based upon the projections and defendant's promise to fund the operating deficit, however, Connellan decided to participate in the project.

In mid-January, 1977, a meeting was held between Connellan, Himelhoch and Smith in Birmingham, Michigan. At that meeting

the plaintiff took an active role explaining to Dr. Smith the means by which the corporation was to be financed. It is obvious that Smith required reassurance in the matter: and significant that plaintiff was the participant who provided the reassurance. Connellan drew a bar graph for Smith to illustrate his concept of "deficit financing" whereby the defendant would put money into the business until the break-even point had been reached. The profits would thereafter be funnelled back to Himelhoch to repay his contributions. No cash was to be paid to the other shareholders until defendant's advances had been repaid along with 9% annual interest. Once again, no time frame for the deficit financing arrangement was discussed, nor was the amount of defendant's contribution mentioned. The plaintiff introduced a bar graph illustration as his second exhibit which he stated was similar to one he drew for Dr. Smith at this meeting. Dr. Smith testified that the bars on the graph were not intended to represent any specific period of time, but only the concept of steadily decreasing cash deficits and then increasing surplus once the break-even point had been achieved. The defendant, who was present during plaintiff's explanation to Dr. Smith, listened, but said nothing.

On both direct testimony and cross-examination, Mr. Connellan was asked to define his perception of the role he would play in NIBC. The plaintiff repeatedly insisted that he had neither time nor money to devote to NIBC for at least six months, but that he envisioned his role as a translator between the financial and business aspects of the corporation and the psychological component. Although plaintiff maintained that he had no financial expertise, the court finds that the plaintiff was neither perceived as a financial novice by the other shareholders, nor did the plaintiff hold himself out as inexperienced when he agreed to join the venture. On the contrary, Dr. Smith chose Mr. Connellan as a promising third member of the corporation precisely because Smith believed Connellan's business expertise would facilitate a better relationship with Mr. Himelhoch, who was to run the enterprise. Furthermore, it is apparent that the plaintiff believed he had the degree of business acumen necessary to insure the success of the venture, despite Smith and McConnell's expressed doubts and mistrust of their fellow shareholder, Mr. Himelhoch.

The clinic opened for business during the first week of February, 1977. Prior to the opening, Mr. Connellan paid Dr. McConnell $1,000.00 for his shares in the corporation and executed a loan agreement jointly with Mr. Himelhoch for office furniture. At defendant's suggestion Himelhoch and Connellan had agreed to borrow money based on the retail value of the furniture, purchase the furniture at wholesale prices and plow the $5,000.00 difference into the business to cover other expenses. Although the note was not introduced at trial, the parties borrowed approximately $20,000.00 from the credit company.

In mid-February, 1977, the plaintiff received a telephone call from Mr. Himelhoch. Himelhoch stated he would be unable to cover a check to the business and asked that plaintiff send him money for expenses. Plaintiff testified that at the time he was able to sympathize with the defendant's apparently temporary predicament and forwarded a personal check made out to NIBC for $2,500.00. Plaintiff did not state when he expected to receive his funds back or what, if any, arrangement for repayment he made with defendant or the corporation.

During the time the clinic was in operation the three shareholders, Connellan, Himelhoch and Smith, met at irregular intervals to discuss corporate business. No official minutes to these meetings were recorded. Thus, in early March, 1977, the shareholders convened to discuss the fact that the corporation was operating at a deficit. Mr. Himelhoch proposed that they alleviate the situation by each contributing to the corporate coffers. The parties agreed that Dr. Smith would contribute $400.00 worth of services each month and that plaintiff and defendant would each make monthly cash infusions of $1,000.00. Although Connellan testified that the deficit was present because the numbers of patients did not

meet the defendant's projections, the record does not indicate how far wrong the defendant's projections had been, what the amount of the deficit was at any time, nor how much money defendant actually contributed to the corporation before he approached his fellow shareholders.

The parties met again at the corporate office toward the end of March, 1977. One item on their formal agenda concerned alternative means of raising income for the corporation. Plaintiff testified that in flipping through the corporation checkbook sometime before the meeting he discovered that Paul Himelhoch had withdrawn $5,000.00 from the NIBC account by writing a check to himself. The evidence had earlier established that defendant was authorized to draw corporate checks for expenses and to run the clinic on a day-to-day basis. It appears to the court that plaintiff made no complaint to defendant about the withdrawal, at the time. This is confirmed by the fact that Dr. Smith testified that he did not learn about the withdrawal until after the corporation had been dissolved, although he was present at the shareholders meeting. When asked by his counsel what affect the $5,000.00 withdrawal had on the corporation, Connellan responded that all he knew was that the business closed two weeks earlier. Without evidence of the corporation's financial condition, which plaintiff has not put into the record, the court is unable to infer that its failure was a result of Himelhoch's withdrawal, or that it was a result of financial shortfalls.

Contrary to plaintiff's contention that the corporation folded because defendant failed to provide the promised financial support and because he improperly drained the corporate funds, Judy Tanter, the clinic director testified that she decided to close NIBC in early April, 1977, because the three shareholders were not making decisions as they should. Mrs. Tanter did testify that she felt the promised financial backing had not materialized, and she heard rumblings that certain bills had not been paid. She complained to both Smith and Connellan that she disagreed with many of Himelhoch's decisions and that she felt embarrassed and angry, but she was not asked to explain the grounds for her concerns to the court. However, Mrs. Tanter affirmed that she had all the supplies needed to run a clinic, it was operational until the doors closed, and her secretary was employed until the end.

Mrs. Tanter also stated that she disagreed with Mr. Himelhoch's growth expectations for NIBC and that she did not recognize the patient-hour projections contained in the Estimate prepared by defendant. Nevertheless, without introducing specific figures Mrs. Tanter indicated that the clinic was receiving a reasonable number of inquiries and responses to its advertising, and that NIBC was growing as she would have wanted before it was shut down.

Within a few days of the late March shareholders' meeting, the plaintiff decided, in his own words, he had had enough. Mr. Connellan stated that after thinking over defendant's performance and his broken promises relative to financing, he called Dr. Smith, Mr. Himelhoch and Mrs. Tanter from a New Orleans airport and told them he wanted out of NIBC. At the time Mr. Connellan did so, Dr. Smith was still actively participating in the clinic's functions. Although Mr. Himelhoch tried to call a meeting to explore continued operation, the plaintiff refused to thereafter involve himself with NIBC at all, beyond a subsequent attempt to mitigate damages by participating in the sale of some of the office furniture.

## COMMON LAW FRAUD

Plaintiff Thomas Connellan would have the court find that he was fraudulently induced to invest in NIBC after relying upon groundless financial projections constructed by defendant Himelhoch, and upon the defendant's false promise to infuse whatever funds were necessary to insure the venture's success. *Candler v. Heigho*, 208 Mich. 115, 175 N.W. 141 (1919) contains a classic statement of the elements which must be demonstrated to recover for fraud under Michigan common law.

The general rule is that to constitute actionable fraud it must appear: (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery." 208 Mich. at 121.

■ The first element listed, that of a material representation, requires that defendant utter a statement of fact, rather than a promise of future performance or the expression of an opinion. *Mieske v. Harmony Electric Co.*, 278 Mich. 61, 270 N.W. 216 (1936); *Schuler v. American Motor Sales*, 39 Mich.App. 276, 197 N.W.2d 493 (1972). An honest but mistaken estimate as to the value of a business is generally considered to be an opinion and not actionable, although the court must examine the circumstances of the cause before it to determine whether the representations made were ones of fact or mere prediction. *Essenburg v. Russell*, 346 Mich. 319, 78 N.W.2d 136 (1956). In this case, the defendant prepared a document containing a projection of profits which he labelled an estimate. The letter accompanying his figures indicated that many factors could alter the projections and reminded plaintiff that all of the cost figures had not yet been included. At trial, the testimony presented by plaintiff confirmed that the hourly rates for therapy and diagnostic counseling contained in the estimate were reasonable. There was no evidence presented which would indicate that the expense estimates listed in defendant's compilation were inaccurate. Thus, those portions of the projection which could be characterized as factual were not shown to be false. However, defendant's projection of the numbers of anticipated patients was merely an estimate of future events which does not rise to the level of a statement of material fact.

As stated by the Michigan Supreme Court in *Martin v. Veana Food Co.*, 153 Mich. 282, 116 N.W. 978 (1908), "Undoubtedly, one may, without legal liability for results, permit another, for a consideration, to share his hopes, however, adroitly the statement of his hopes may be phrased." The court, therefore, finds that the financial projections for the corporation's success, which hinged upon the defendant's predictions of patient response, were not misrepresentations of material fact, but defendant's opinion of future profitability. Consequently, plaintiff's allegations of fraud related to the financial projection must fail as defendant made no material representations of fact.

■ The court further finds that plaintiff did not rely upon the defendant's financial analysis in arriving at his decision to invest in NIBC. While the prospect of a relatively low-cost, high-return venture, which defendant's projections reflect, obviously attracted plaintiff, defendant's estimates predict a surplus cash flow the first month of business. Despite this prediction, Mr. Connellan testified that he expected NIBC to follow the usual pattern of running in the red for several months after opening. Rather than relying upon Himelhoch's optimistic predictions, Mr. Connellan appears to have fallen back on his own knowledge and expertise to arrive at the concept of deficit financing which he explained to Dr. Smith. Obviously, unless the necessary element of reliance upon a representation has been demonstrated, a cause of action for fraudulent inducement is not sustained.

■ As to plaintiff's allegation that he was misled by Himelhoch's promise to fund NIBC, as a general rule promises to render future performance are normally considered contractual in nature and may not serve as the basis of a complaint for fraudulent misrepresentation. *Boston Piano and Music Co. v. Pontiac Clothing Co.*, 199 Mich. 141, 165 N.W. 856 (1917). A narrow exception to this rule recognizes that an actionable tort can be based upon a promise made without a present intention of performance,

when the promise is given for the purpose of deceiving the promisee and influencing his conduct. *Ainscough v. O'Shaughnessey*, 346 Mich. 307, 78 N.W.2d 209 (1956); *Dixon v. Dixon*, 16 Mich.App. 42, 167 N.W.2d 464 (1969). Evidence of defendant's "bad faith" intention must relate to conduct at the time the fraudulent promise was made or almost immediately thereafter. *Hi-way Motor Company v. International Harvester Company*, 398 Mich. 330, 247 N.W.2d 813 (1976).

■ In the case at bar, plaintiff alleges that his decision to invest in NIBC was based upon defendant Himelhoch's bad faith promise to fund the corporation's operating deficit. The plaintiff argues that defendant Himelhoch either had no intention of funding the deficit when he promised to do so or he well knew that he had no means at that time of financing the venture. Although plaintiff's theory is viable, his proofs failed to demonstrate a right to recovery. The court must assess Himelhoch's conduct to ascertain defendant's intention at the time the alleged promise was made. The evidence which plaintiff presented at trial gives little indication as to how much or how little Himelhoch actually did in terms of financing NIBC, or what the financial condition of the corporation was during its operating life. The court does not, therefore, have any factual foundation upon which to premise a finding of bad faith intention.

■ When considering a Rule 41(b) motion for involuntary dismissal, the court need not construe the evidence in a light most favorable to the non-moving party. Rather, the trial judge must weigh the evidence and arrive at a decision on the merits. *Bach v. Friden Calculating Machine Company, Inc.*, 148 F.2d 407 (6th Cir. 1945). However, even giving the plaintiff the benefit of the doubt, the court finds that Mr. Connellan presented no evidence of defendant's conduct reflective of a bad faith intention not to keep any promise which he made.

The testimony established that Mr. Himelhoch promised Dr. Smith he would fund the corporation's operating deficits up to $25,000.00 before Mr. Connellan became involved in NIBC. Mr. Connellan testified that defendant promised to fund any operating deficits which might occur, but that no dollar amounts or time limits for this commitment were mentioned. The letter which Mr. Himelhoch sent Mr. Connellan along with his projection of income and expenses estimates start-up costs of between ten and fifteen thousand dollars. The estimates themselves project no operating deficits. The court concludes that Mr. Himelhoch promised either to fund start-up costs only, since no operating deficits were projected by defendant, or to fund start-up costs and deficits should they arise up to $25,000.00. There is no evidence that defendant did not intend to honor his commitment at the time it was made or indeed that he failed to do so.

Mrs. Tanter testified that the clinic doors opened on February 1, 1979, and that supplies, remodeling and carpentry work, and advertising had been purchased for the corporation. The amount of these start-up costs was not made a part of the record, nor was the source of their payment presented.

To allow the court to arrive at a finding of bad faith intention on the part of Mr. Himelhoch, the plaintiff must have presented at least some evidence that start-up costs or operating deficits were not paid, or were paid from sources other than the defendant. Mr. Connellan failed to do this. Plaintiff did not argue that he was denied access to corporate books and financial records, and the court cannot excuse the lapses in plaintiff's evidence on these grounds. Mr. Connellan, himself, established that he had access to NIBC's checkbook during the clinic's operating life. While he "flipped through" the checks written, Mr. Connellan testified that he did not look at, nor inquire of what deposits had been made to the corporate account. As plaintiff has failed to offer any factual evidence on the source of NIBC's funds, the court will not assume that defendant Himelhoch failed to pay for the start-up costs and operating deficit in whatever amount those financial obligations reached. Thus, it has no evidence before it to support a conclusion that Mr. Himelhoch did not intend to fund NIBC or that he had no money to do so.

Plaintiff apparently relies upon two incidents to demonstrate that Himelhoch had no intention of honoring his promise to fund the corporation. Mr. Connellan points out that Mr. Himelhoch called him and asked for funds only a few weeks after the clinic opened. Without evidence as to what money the clinic had been operating on prior to this call, the court cannot and will not conclude that Himelhoch had failed to perform as he had promised before the call was made. It is conceivable that expenses well in excess of $25,000.00 had already been paid by defendant at the time he asked plaintiff to pitch in. While the actuality of this controversy may be quite different, the fact finder is not to presume the worst or to require a defendant to proceed with his case when plaintiff has failed to demonstrate even minimally the factual basis upon which he predicates his claims.

■ Similarly, the plaintiff urges that the $5,000.00 check which defendant wrote to himself in March, was demonstrative of his intention not to fund the corporation as promised. Once again, without background as to the financial history and condition of the corporation, defendant's withdrawal of funds is meaningless. Consequently, plaintiff's claim of common law fraud is denied by the court on its merits.

## VIOLATIONS OF FEDERAL SECURITIES LAW

■ Mr. Connellan bases his federal cause of action upon Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10(b)–5 promulgated by the Securities and Exchange Commission. In pertinent part Rule 10(b)–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . .

\* \* \* \* \* \*

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .

Basically, Rule 10(b)–5 creates a duty not only to speak truthfully in connection with the sale of securities but to disclose the full truth. *List v. Fashion Park, Inc.*, 340 F.2d 457 (2nd Cir., 1965). The plaintiff argues that Mr. Himelhoch breached his duty to speak the full truth when he gave the plaintiff a grossly inaccurate projection of NIBC's potential earnings and when he promised to fund the corporation's operating deficit. As was the case with plaintiff's claim of common law fraud, the proofs failed to demonstrate the inaccuracy or untruthfulness of Mr. Himelhoch's statements. Furthermore, without the requisite factual background the court is unable to find that Mr. Himelhoch made his statements with the "scienter" necessary to sustain a cause of action under Section 10(b) and Rule 10(b)–5. *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 688 (1976).

■ The plaintiff is quite correct in arguing that the standards of Rule 10(b)–5 may be violated by an inaccurate or misleading projection of future earnings. In *Marx v. Computer Sciences Corporation*, 507 F.2d 485 (9th Cir. 1974), the plaintiff asserted he had been misled by a statement of projected earnings; the appellate court set aside summary judgment for the defendant. At the time the statement was made the defendant corporation had significant facts before it to indicate that it would not experience a financially successful year. Nevertheless, the defendant's vice-president delivered a speech in which he made specific projections of outstanding earnings performance. The *Marx* opinion held that plaintiff had raised genuine issues of material fact as to whether the financial projections made by the defendant's vice-president had been untrue and misleading due to the omission of material information. On the other hand, that court notes that, "[u]nder securities law a reasoned and justified statement of opinion, one with a sound factual or historical basis is not actionable." *G & M, Inc. v. Newbern*, 488 F.2d 742 (9th Cir. 1973).

In the case at bar, plaintiff has failed to convince the court that the defendant's projection did not represent a reasoned and justified opinion. There was no showing that the hourly rates were not reasonable. While Dr. Smith and Mrs. Tanter both denied any knowledge as to the source of Mr. Himelhoch's expectations for patient growth, Dr. Smith stated that as many as one hundred inquiry calls had been received in response to small ads in Ann Arbor newspapers for the clinic he and Dr. McConnell operated. That historical experience appears to have been the reason for Himelhoch's initiation of a radio advertising campaign. The plaintiff called Mrs. Tanter and Dr. Smith as his witnesses, but they did not testify that the projections were fantastic, impossible or even unlikely in light of their experience. The court was not even informed how far Mr. Himelhoch's projections fell below the reality. With no basis upon which to judge the accuracy of the projections, the court is unable to gauge Mr. Himelhoch's mental state when he prepared the projections. Thus, it cannot find that he possessed scienter in misleading Mr. Connellan.

In the same vein, the proofs failed to demonstrate that Mr. Himelhoch's promise to fund NIBC was untruthful or that he omitted any material fact which would have made his statement not misleading under the circumstances. The court has no idea as to where NIBC's operating funds came from other than the loan proceeds that were partially utilized for furniture. Mr. Connellan testified that he and defendant agreed to funnel an additional $5,000.00 from the loan to NIBC but plaintiff did not know whether the proceeds were ever received or what became of them. Mr. Connellan forwarded $2,500.00 to the corporation, but its affect is unknown. Based on the facts which plaintiff has placed before it, the court does not believe that Mr. Himelhoch's promise to Mr. Connellan was untruthful or that defendant omitted to state a material fact that would have made his promise not misleading. The plaintiff's prayer for recovery based upon the federal securities laws is therefore dismissed.

## VIOLATIONS OF STATE BLUE–SKY LAWS

Finally, plaintiff contends that Mr. Himelhoch violated Sections 101 and 301 of the Michigan Blue-Sky Law. (M.C.L. § 451.501 and M.C.L. § 451.701). Section 101 entitled "Uniform securities act; fraudulent and other prohibited practices," is modeled closely on Rule 10(b)–5 of the Securities and Exchange Commission. The proofs for this claimed violation are parallel to those applicable to the federal law and the court reaches the same conclusions it did earlier. Plaintiff's proofs have failed to demonstrate that Mr. Himelhoch made any untrue statement of material fact or that he omitted to state a material fact necessary to make his statements not misleading.

Plaintiff closed his case by calling defendant Himelhoch to the stand and asking whether he was a registered broker-dealer or whether the NIBC transaction had been registered with the state corporate securities commission. After defendant answered negatively to both queries, the plaintiff rested.

Section 301 of the Michigan Blue-Sky Law makes it unlawful for any person to offer or sell any security unless it is registered or the transaction is exempted pursuant to statute. A defendant bears the burden of proving an exemption once the issue has been raised by the plaintiff. *Ferar v. Hall*, 330 Mich. 214, 47 N.W.2d 79 (1951). Based upon the testimony adduced during the course of plaintiff's presentation, however, the court finds that this transaction was of an isolated nature and would qualify for an exemption under M.C.L. § 451.-802(b)(9). That section of the statute exempts from the registration requirements transactions offered to not more than fifteen persons within a twelve month period if the seller reasonably believes that all Michigan buyers are purchasing for investment purposes and no remuneration is given to the solicitor of the securities sale. The facts of this case indicated, undisputedly, that offers to participate in NIBC were strictly limited to the personae of this lawsuit. In fact, Dr. Smith and not Mr. Himelhoch chose the plaintiff as a potential par-

ticipant when Dr. McConnell decided to disassociate himself from the endeavor. There are no grounds upon which the court could believe that an offer was made to more than fifteen persons, and plaintiff has not even raised the contention that Mr. Himelhoch or Dr. Smith received any remuneration for solicitation. The court therefore finds that Section 301 of the Michigan Blue-Sky Act has not been violated.

Based upon the findings of fact and conclusions of law enumerated in this memorandum, plaintiff's complaint and defendant's third-party complaint are hereby ordered dismissed.