**ADVANCED ACCESSORY SYSTEMS, LLC, Plaintiff–Appellant, Cross–Appellee,**

v.

**Andy GIBBS; and Doug Gibbs, Defendants–Appellees, Cross–Appellants.**

Nos. 01–1740, 01–1796, 01–2245.

United States Court of Appeals, Sixth Circuit.

July 16, 2003.

Before BATCHELDER and ROGERS Circuit Judges; and BARZILAY,* Judge.

BATCHELDER, Circuit Judge.

This case in diversity arises from a soured business relationship between Ad-

vanced Accessory Systems, LLC ("Advanced") and brothers and business partners Andy Gibbs and Doug Gibbs ("the Gibbses"), after Advanced purchased the Gibbses' company, entered into employment agreements with the Gibbses and then became dissatisfied with the deal. Advanced sued the Gibbses for fraud and breach of contract, and the Gibbses counterclaimed against Advanced, its parent company MascoTech and the latter's corporate affiliates, and three corporate officers of the named companies (collectively "Advanced") for breach of contract, violations of California labor laws, conspiracy to violate labor laws, intentional infliction of emotional distress, and abuse of process, and demanded an accounting and indemnification. After many of the Gibbses' claims were dismissed by agreement of the parties, the district court granted summary judgment to the Gibbses on Advanced's fraud claims and to Advanced on the Gibbses' claims of intentional infliction of emotional distress, abuse of process and conspiracy. The breach of contract claims were tried to a jury, which found in favor of the Gibbses, and awarded $1.9 million to each brother. The Gibbses and Advanced both appeal.

Because the record does not contain sufficient credible evidence to support the incentive compensation component of the jury verdicts, we remand to the district court with instructions to make a final determination of damages consistent with this opinion. On the other issues before us. we affirm the judgment of the district court.

I

In the early 1990s, Andy and Doug Gibbs founded a company called Sport

* The Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

Rack Systems ("SRS") in Yuba City, California, to develop and produce automobile racks to hold bikes, skis, snowboards, and the like. In 1992, Advanced[1] was interested in entering the rack and rack accessories business, and decided to purchase the needed technology and expertise from an existing enterprise rather than attempt to develop such technology itself.

After conducting due diligence on SRS for approximately six months, Advanced contracted with the Gibbses to purchase all of SRS's stock. In order to retain the knowledge and expertise of the Gibbs brothers, Advanced entered into an Employment Agreement with each of them. Each Employment Agreement stipulated a base salary of $110,000, an annual bonus based upon a percentage of Advanced's net sales,[2] a one-time "incentive compensation" payment of $500,000 if Advanced's aggregate net sales of specified products between 1993 and 1998 reached $400,000,000, and severance pay of $55,000. Each Agreement provided that if the respective Gibbs brother were terminated for cause, all of his employment benefits would cease; however, if Advanced terminated him without cause, Advanced was obligated to pay him for the duration of the contract.

After Advanced purchased SRS, it allowed the Gibbses and a small team of their employees to remain in California,[3] where their division was renamed the Pacific Design Group ("PDG"), and was responsible for the design, marketing, and sales of racks and rack accessories. When PDG did not produce the profits that the Gibbses had predicted, the Gibbses attributed PDG's difficulties to making the transition into Advanced and quarrels with Advanced's management, as well as the alteration of PDG designs by Advanced without notice to the Gibbses. In the summer of 1994, less than two years after the Purchase Agreement was signed, Advanced closed PDG Engineering in California and moved all of PDG's equipment to Advanced's headquarters in Michigan, save a few items that would allow the Gibbses to maintain an office in California.

In August 1994, Doug Gibbs was given a list of projects over which he maintained some responsibility, but the Gibbses were given no substantive assignments after January 1995. In autumn 1995, MascoTech sold Advanced to an investment group that included Advanced executive Marshall Gladchun. In preparing the financial statements attendant to this transaction, Advanced booked its employment contracts with the Gibbses as an estimated $2.1 million liability in order to reflect the money owed to the Gibbses under their Employment Agreements over the next few years. This amount was raised to approximately $2.7 million paid out over time, or about $2.2 million present value, in later MascoTech estimates.

In January 1996, Advanced stopped paying the Gibbses their salaries and bonuses, although it did not terminate their employment contracts. Because they remained

---

1. Advanced was called by several different names between 1992 and 1995. At the time it became involved with the Gibbses, it was known as "Huron/St. Clair, Inc.", which was an operating unit of MascoTech, Inc., a $1.5 billion company that engaged in numerous mergers and acquisitions. Huron/St. Clair later became MascoTech Accessories, which was sold in 1995 and then renamed Advanced Accessory Systems. We will refer to the company as "Advanced."

2. The total amount of these annual bonuses, over time, was capped at $1.4 million for each Gibbs brother.

3. Under the terms of their Employment Agreements, the Gibbses were entitled to remain in California.

employees of Advanced. the Gibbses were required under their Employment Agreements to "work from home" during normal business hours and to refrain from engaging in other employment in the car rack industry.

Shortly thereafter, Advanced sued the Gibbses, alleging fraud, on the grounds that the Gibbses had misrepresented themselves in the initial sale of SRS to Advanced, and breach of the Purchase Agreement and Employment Agreements; and demanding indemnification for all losses, attorneys' fees, and court costs pursuant to the Purchase Agreement. The Gibbses filed a counterclaim against Advanced, MascoTech and its corporate affiliates, and three individual corporate executives, claiming breach of contract for failure to pay under the Employment Agreements; two violations of the California labor code; conspiracy to deny the Gibbses their salaries and bonuses in violation of California law; intentional infliction of emotional distress; indemnification; and abuse of process; and demanding an accounting.

After both sides filed for summary judgment, the Gibbses stipulated to the dismissal of all claims against Masco Industries, Masco Corp., MascoTech, and the individual executives, except the California labor law claims, which the district court dismissed, granting the Gibbses leave to amend their counterclaim to bring those claims under Michigan law. The court then granted the Gibbses' summary judgment motion with respect to the fraud claims brought against them, holding that Advanced had provided no evidence showing the falsity of certain representations made by the Gibbses in connection with the sale and operation of SRS. Lastly, the court granted summary judgment to Advanced on the Gibbses' claims of intentional infliction of emotional distress, abuse of process, and conspiracy.

The breach of contract claims of each party were tried to a jury, which returned a verdict in favor of the Gibbses for $3.8 million. Over the Gibbses' objections, the court entered judgment on the jury verdict on August 6, 1999, so as to end the running of prejudgment interest at 12%. The court held that it would hear arguments pertaining to indemnification and amend the judgment if necessary at a later time. The court also denied Advanced's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial.

The parties tried to appeal at this point, but we dismissed their appeal for lack of jurisdiction because the Gibbses' claim for attorneys' fees as an element of their counterclaim for indemnification was still outstanding. This claim was referred to a magistrate, who issued a Report and Recommendation (the February 4, 2000, Report and Recommendation), recommending, among other things, that notwithstanding the fact that the judgment included damages for claims that did not accrue until after the counterclaim was filed, prejudgment interest should accrue on the entire judgment from the date that Gibbses filed the counterclaim. The February 4, 2000, Report and Recommendation was adopted without any alteration by the district court. The magistrate issued a second report (the March 1, 2001, Report and Recommendation), which was adopted in its entirety by the district court on April 25, 2001, determining in part the amount of attorneys' fees to be awarded the Gibbses and determining the method by which the remaining award of attorneys' fees would be calculated. On May 9, 2001, the Gibbses moved for an entry of final judgment, or, in the alternative, an entry of an amended judgment. The district court denied this motion on

August 22, 2001, holding that its judgment of April 25, 2001, adopting the March 1, 2001, Report and Recommendation, constituted a final judgment. Timely notices of appeal and cross-appeal followed.

## II

### A. Jurisdiction

 We note preliminarily that the orders appealed from are final for purposes of appeal despite the lack of specific dollar figures for the attorneys' fees owed for Graham's and Miller's[4] time or for the prejudgment interest. "In general, a 'judgment' or 'decision' is final for the purpose of appeal only 'when it terminates the litigation between the parties on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined.'" *Parr v. United States,* 351 U.S. 513, 518, 76 S.Ct. 912, 100 L.Ed. 1377 (1956) (quoting *St. Louis, I.M. & S. Ry. Co. v. S. Express Co.,* 108 U.S. 24, 28, 2 S.Ct. 6, 27 L.Ed. 638 (1883)). In *United States v. F. & M. Schaefer Brewing Co.,* 356 U.S. 227, 78 S.Ct. 674, 2 L.Ed.2d 721 (1958), the Court examined several factors to determine when a district court's judgment is final. Primarily, a reviewing court should consider "whether the [trial] judge has or has not clearly declared his intention" that his opinion "embody a final decision." *id.* at 232, 78 S.Ct. 674 (emphasis removed), or whether all of the elements necessary for a final decision are present in a given order or opinion. *Id.* at 232–33, 78 S.Ct. 674. Though a court's primary focus should be on the judge's intention, the Supreme

Court intimated that a proper final judgment should also contain certain elements: a money judgment "must, at least, determine, or specify the means for determining, the amount." *Id.* at 233–35, 78 S.Ct. 674; *see also McDermitt v. United States,* 954 F.2d 1245, 1248–50 (6th Cir.1992) (examining the sufficiency of a money judgment the district court clearly intended to be a final judgment).

Here, the *Schaefer Brewing* requirements have been satisfied. The district court expressly stated "that its April 25, 2001, order and judgment constitutes a final judgment because it disposes of all of the claims of all of the parties.... No other ruling is needed by this court to specify damages." Moreover, although the attorneys' fees have not yet been calculated, and hence, because those fees are an element of the Gibbses' indemnification claim, the total award of damages upon which the prejudgment interest may be calculated has not been set, "the means for determining" the amount of the final judgment are available to the parties, and neither party's appeal touches upon issues that are unresolved as a result of the district court's failure to place a dollar value in its final judgment. "Furthermore, the Supreme Court has adopted 'a uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final.'" *Tahfs v. Proctor,* 316 F.3d 584, 590 (6th Cir.2003) (quoting *Budinich v. Becton Dickinson and Co.,* 486 U.S. 196, 202, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)).

---

4. When the Gibbses were sued, they initially retained the California law firm of Graham & James, who in turn retained the Michigan firm of Miller Canfield as local counsel, to defend the suit and prosecute the counterclaims. The Gibbses incurred almost $200,000 in legal fees from these two firms, and ran out of funds to continue to retain their services. They were able to persuade their current attorneys from the firm of Martens Ice to take their case on a contingency fee basis.

## B. Entry of final judgment

In a related matter, the Gibbses charge that the district court erred by failing to enter a final or amended judgment pursuant to Rule 60(a), which allows a district court to correct "clerical mistakes in judgments [and] orders ... arising from oversight or omission ... at any time of its own initiative or on the motion of any party." Fed.R.Civ.P. 60(a). As we have already explained, the district court did enter a final judgment. The fact that the district court did not write down all of its holdings in one place for the ease and convenience of the parties does not render the judgment less than final, and the court's denial of the Rule 60(a) motion was not an abuse of discretion. *See Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 936 (1st Cir.1995) (considering an appeal in which the "final judgment" was composed of a number of different district court rulings, and noting that "[w]ere we to remand for entry of a 'final judgment' that is formally in full compliance with Rule 58, before deciding the appeal that has now been briefed and argued, the case would in due course be back before us again with precisely the same issues to be decided as those we perceive from the record now before us.").

## C. Jury award of incentive compensation

■ Advanced requests a new trial or, in the alternative, a remittitur decreasing the total amount of the jury award by $1 million based upon its contention that the jury was not presented with evidence upon which it could award $500,000 of incentive compensation to each of the Gibbs brothers. We review for abuse of discretion the district court's decision whether to grant a new trial, *Conte v. General Housewares Corp.,* 215 F.3d 628, 637 (6th Cir.2000), and "the jury's verdict should be accepted if it is one which could reasonably have been

reached." *Id.* (citations and internal quotations omitted). The standard for obtaining a remittitur is high:

> A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the conscience of the court. If there is any credible evidence to support a verdict, it should not be set aside. The trial court may not substitute its judgment or credibility determinations for those of the jury.

*Farber v. Massillon Bd. of Educ.,* 917 F.2d 1391, 1395 (6th Cir.1990) (internal quotations and citations omitted). We review a district court's denial of a motion for remittitur for an abuse of discretion. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

Advanced argues that the jury was presented with no credible evidence to uphold the award of $500,000 incentive compensation to each Gibbs brother. The Gibbses' Employment Agreements each provide that "if aggregate Net Sales of Products for the five year period beginning January 1, 1993 and ending December 31, 1997 is at least $400,000,000, the Executive shall receive" incentive compensation of $500,000. The "products" to which the agreements refer are "roof racks, integrated electronics in roof rack systems, other roof rack accessories and related rack products sold within the transportation industry." The parties stipulated to sales figures showing that the Net Sales of Products from 1993 through the end of 1997 was only $323 million, approximately $77 million short of the $400 million necessary to trigger the award of incentive compensation to the Gibbses. The Gibbses argue that each of

them is entitled to that compensation because the $400 million mark would have been met had Advanced not impeded the Gibbses' efforts and eventually breached their employment agreements.

"A damage award must not be based on 'mere speculation, guess, or conjecture.'" *John E. Green Plumbing & Heating Co. v. Turner Constr. Co.*, 742 F.2d 965, 968 (6th Cir.1984). We find in this record no factual basis for the jury's award of incentive compensation to the Gibbses. Rather, the record shows that in the years after the PDG operations were closed (1996 and 1997), Advanced realized significant increases in Net Sales. The record does not support the contention that while PDG was in operation, it was helping the bottom line with regard to Net Sales such that Advanced would have realized far more in sales had it not shut down PDG and stopped using the Gibbses' talents, even if we account for the possibility that the efforts put forth at PDG from 1993 through 1995 directly contributed to the increased sales in 1996 and 1997. In any event, both Advanced and the Gibbses had strong economic incentives to maximize the Net Sales figure, and there is no evidence that Advanced sabotaged its own prospects of success in the rack market (to the tune of $77 million) in order to deprive the Gibbses of $1 million in incentive bonuses.

Since the award of incentive compensation is easily separated out from the rest of the damages award in this case,[5] we instruct the district court on remand to reduce the monetary award to each Gibbs brother by $500,000.

**D. Reducing damages to present value/Calculating prejudgment interest**

■ Advanced contends that the damages award, which included payments to which the Gibbses were entitled under the Employment Agreements but which had not yet come due at the time their counterclaim was filed, should have been reduced to present value because prejudgment interest began to run on the award from the date of the Gibbses' filing. In its Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial, Advanced complained that "[t]he Gibbs' [sic] claimed damages included amounts not yet due when the Complaint was filed; but the Gibbs did not provide any evidence reducing their damage claims to present value; and, as a result, any damages were excessive as a matter of law." The district court denied this motion, and Advanced renewed its objection regarding the calculation of damages before the magistrate judge. The magistrate judge recommended that prejudgment interest be calculated on the entire award, and by order dated March 15, 2000, the district court adopted that recommendation without alteration. In its notice of appeal, Advanced noted that it was appealing the district court's denial of its Motion for a JNOV, or in the Alternative, for a New Trial, and "any other prior adverse order[ ]" that was entered by the district court. The Gibbses now argue that because the notice of appeal did not specify that it was appealing the district court's March 15, 2000. order. Advanced is procedurally barred from raising the present value issue.

We conclude that the issue is properly before us. By specifying both the district

---

**5.** The jury could not have reached $3.8 million in contractual damages if it had not included $1 million of incentive compensation in that amount. Because, under the terms of the Employment Agreements, incentive compensation was either due the Gibbses in full or not due them at all, we can easily determine what the jury's verdict would have been had it not included the award of incentive compensation.

court's order denying its Motion for JNOV, and "any other prior adverse orders" in its Notice of Appeal, Advanced complied sufficiently with Rule 3(c)(1)(B) of the Federal Rules of Appellate Procedure. Advanced briefed the present value issue in its initial brief before this court; Advanced's Motion for JNOV mentioned the present value issue; and the district court's March 15, 2000, order adopting the magistrate's February 4, 2000, Report and Recommendation was certainly an "adverse order."

■ Advanced argues that the damages award is excessive because it includes prejudgment interest both on the damages that had accrued by the time the counterclaim was filed and on future damages—payments to which the Gibbses would have been entitled under the Employment Contract, but which were not yet due when the counterclaim was filed—not reduced to present value. The Gibbses urge us to review this claim for plain error, since Advanced neither asked for the jury to be instructed on present value nor objected to the lack of such an instruction. We need not determine whether or not Advanced was required to raise this issue in the context of jury instructions in order to preserve its full rights on appeal, since, even if we review the issue de novo, we conclude—albeit somewhat reluctantly—that the district court did not err in calculating prejudgment interest on the future damages without reducing them to present value.

Citing *H.J. Tucker and Associates, Inc. v. Allied Chucker and Engineering Co.,* 234 Mich.App. 550, 595 N.W.2d 176 (1999), this circuit recently held that "[w]e are convinced Michigan law requires that prejudgment interest be calculated ... on the entire judgment from the date that the complaint was filed," even when certain monetary claims included in the judgment

had not accrued at the time of filing. *Perceptron, Inc. v. Sensor Adaptive Machs., Inc.,* 221 F.3d 913, 923 (6th Cir.2000). *Tucker* relied upon *Paulitch v. Detroit Edison Co.,* 208 Mich.App. 656, 528 N.W.2d 200 (1995), which, it is important to note, was a case in which the jury did not receive an instruction regarding the present value of future damages, and the judgment was not reduced to present value by the court. Noting that the Michigan courts were split on the issue, and that awarding prejudgment interest on future damages not reduced to present value resulted in a double benefit to the plaintiff, the *Paulitch* court nonetheless held that strict construction of the Michigan statutes–Mich. Comp. L. §§ 600.6013 and 600.6301–required that prejudgment interest be calculated on the award of future damages. *Paulitch,* 528 N.W.2d at 204. Like the Chief Justice of the Michigan Supreme Court, who found this interpretation of Michigan's statutory scheme both sound as a matter of statutory construction and "troubling" as a matter of public policy, *Buzzitta v. Larizza Indus., Inc.* 465 Mich. 975, 641 N.W.2d 593, 593–94 (2002) (Corrigan, C.J., concurring), we are troubled by the awarding of prejudgment interest on future damages, but we think that Michigan law requires this result. We instruct the district court, on remand, to calculate the prejudgment interest in accordance with the latest version of Mich. Comp. L. § 600.6013, effective March 22, 2002, which alters the rate of prejudgment interest for actions filed at the time the Gibbses brought their counterclaim.

### E. Timing of the entry of judgment

■ The Gibbses argue that the district court erred when it entered judgment on the jury verdict before the court determined indemnification damages, thereby causing the judgment to accrue interest at

the (then much lower) federal post-judgment rate instead of the (then much higher) prejudgment rate, which is set by Michigan law. *See Diggs v. Pepsi–Cola Metro. Bottling Co.*, 861 F.2d 914, 924 (6th Cir.1988) (explaining that, in diversity cases, "questions of prejudgment interest ... are to be determined under state law." while "federal law governs the rate of postjudgment interest"). The court noted that it would amend the judgment, if appropriate, after holding a hearing on the indemnification claims. Advanced defends the district court's action, noting that equitable considerations support the entry of judgment on the jury verdict insofar as the Gibbses had a strong incentive to drag out the indemnification hearings as long as possible, given that interest was accruing at 12%.

Fed.R.Civ.P. 54(b) states that a district "court may direct the entry of a final judgment as to one or more but fewer than all of the claims ... upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Entry of judgment on less than all of the claims in a lawsuit is within the discretion of the district court, and we review its actions in this instance for an abuse thereof. *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436, 76 S.Ct. 895, 100 L.Ed. 1297 (1956).

Under 28 U.S.C. § 1961(a), "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." We have held that for interest to begin running under § 1961, there must be a judgment that "unconditionally entitles" a party to fees or damages, even if the amount of the damages has not been quantified. *Associated General Contractors of Ohio, Inc. v. Drabik*, 250 F.3d 482, 491–92 (6th Cir.2001). "[P]ost-judgment interest runs from the date of any judgment that is not entirely set aside," including an "ini-

tial, partial judgment ... even though that judgment was not yet appealable." *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 429 (6th Cir.1999).

The Gibbses assert that "the District Court's Judgment on the Jury Verdict was *not* a final. appealable judgment and did *not* meaningfully ascertain all of [their] damages." Even so. our precedents indicate that the judgment rendered by the district court was sufficient to trigger the running of postjudgment interest under § 1961 because the judgment entered unconditionally entitled the Gibbses to damages. The district court did not, therefore, abuse its discretion in entering its Judgment on the Jury Verdict prior to addressing the Gibbses' indemnification claims.

F. Award of attorneys' fees

In his February 4, 2000, Report and Recommendation, the magistrate judge concluded that the "reasonable attorney fees" owed to the Gibbses under the indemnification provision of the Purchase Agreement were not to be measured by the amount of the contingency fee award garnered by Martens Ice for its successful defense of Advanced's claims and prosecution of the Gibbses' counter-claims, but instead by a reasonable rate measuring the value of its services. In his March 1, 2001, Report and Recommendation, the magistrate determined a "lodestar" amount of attorneys' fees owed to the Gibbses by multiplying by $200 the number of hours expended by Martens Ice, then reducing that total amount 5% for prosecution of frivolous, unsuccessful claims. The Gibbses argue that they should have been awarded their actual attorneys' fees and costs, measured by the amount of the contingency fee; in the alternative, they claim that the lodestar amount should have been multiplied by 2 in order to reflect the fact that Martens

Ice took their "undesirable" and risky case on a contingency basis.[6] They also claim that they should be awarded their attorneys' fees, costs, and expenses on appeal.

Under Michigan law, parties to a contract may agree that the breaching party must pay the reasonable attorneys' fees of the other side. *Zeeland Farm Servs., Inc. v. JBL Enters., Inc.*, 219 Mich.App. 190, 555 N.W.2d 733, 736 (1996). We review for abuse of discretion the district court's determination on fees. *See Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 312 (6th Cir.1997). The factors a court applying Michigan law should consider when examining the reasonableness of attorneys' fees include

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

*Zeeland*, 555 N.W.2d at 737 n. 3.

Though Michigan courts have awarded attorneys' fees based upon the amount of a contingency fee in some circumstances, *see*

*City of Detroit v. J. Cusmano & Son, Inc.*, 184 Mich.App. 507, 459 N.W.2d 3, 5–6 (1989) (affirming a trial court's award of attorneys' fees based upon the amount a 33% contingency fee arrangement after examining many of the factors set forth in *Zeeland*), those courts have nonetheless held that "the amount defendant agreed to pay his attorneys' under the contingency fee agreement is not irrebuttable proof that the same amount should be awarded to defendant as a reasonable attorney fee." *City of Flint v. Patel*, 198 Mich.App. 153, 497 N.W.2d 542, 545 (1993). In other words, whether an attorney is working on a contingency basis should be considered, but only as one factor among several.

In *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Supreme Court emphasized the merits of using a lodestar calculation as opposed to awarding attorneys' fees based upon the amount of a continency fee, and the desirability of eschewing the use of a multiplier to rachet up the lodestar amount based upon the difficulty of the legal issues or the riskiness of assuming a case. *Id.* at 562–67, 112 S.Ct. 2638. Though that decision dealt with the award of attorneys' fees specified in certain federal statutes, and is therefore not binding on the district court in this instance, it does offer strong persuasive authority for the reasonableness of the district court's calculation.

In this case, after rejecting the Gibbses' contention that a reasonable fee is per se the amount of the contingency fee in this case, the magistrate determined a reasonable rate–$200 per hour–by examining some of the factors set out under Michigan law. We think that the approach taken by

---

**6.** The Gibbses assert a difference of over $1.2 million between the indemnification awarded them by the district court and the actual amount of their attorneys' fees, costs, and expenses.

the magistrate, which was subsequently adopted by the district court, accords with the dictates of Michigan law, and therefore hold that the district court did not abuse its discretion in this matter.

The Gibbses also claim that the award of attorneys' fees should have included a provision for appellate fees, costs, and expenses. In *Schellenberg v. Rochester Elks,* 228 Mich.App. 20, 577 N.W.2d 163, 179 (1998), the "plaintiff [sought] to recover attorney fees incurred in defending this appeal and prosecuting its cross appeal. Such an award is proper under the act" which provides for attorneys' fees (although not appellate fees specifically). Similarly, in *Central Transport, Inc. v. Fruehauf Corp.,* 139 Mich.App. 536, 362 N.W.2d 823 (1984), the court found that "[a]ttorney fees awarded under the lease agreements are an item of damages arising from breach of those agreements. A contractual provision for reasonable attorneys' fees in enforcing provisions of the contract may validly include allowance for services rendered upon appeal." 362 N.W.2d at 829. In the latter case, the court remanded the issue to the trial court to make a determination of whether the contractual provision encompassed attorneys' fees on appeal; if it did, the appeals court instructed the trial court to include appellate costs and fees in the damages award. *Id.*

As did the court in *Central Transport,* we instruct the district court on remand to consider whether, pursuant to the contract between the Gibbses and Advanced, the Gibbses are entitled to their appellate attorneys' fees and costs, and, if so, to include such fees and costs in its final damages calculation.

### G. Evidence of pre-trial negotiations

■ Advanced argues that the district court erred in admitting–over Advanced's objections–evidence regarding (1) discussions, which were held in 1995 among Advanced executives as they contemplated the sale of Advanced to a group of investors, about how to book the Gibbses' Employment Agreements and the possibility of buying out those contracts, and (2) a letter sent by Andy Gibbs to Advanced in August of 1995, to which he never received a response, proposing that Advanced buy out the Gibbses' contracts. Advanced claims that these communications should be considered settlement negotiations whose content is inadmissible under Fed. R.Evid. 408, despite the fact that the communications in question all took place prior to the filing of any legal claim by Advanced or the Gibbses. It argues, in the alternative, that the prejudicial impact of the communications outweighs their probative value, and that the communications should have been excluded under Rule 403.

These contentions are meritless. In 1995 when these discussions were held and the letter was sent, there was no clearly-defined disputed claim between the parties that they could have settled.[7] In fact, the letter from Andy Gibbs and the internal communications at Advanced, when viewed together, indicate that the parties held a similar understanding regarding Advanced's obligation to pay the Gibbses under the Employment Agreements. Moreover, we think that these communications are probative of the true nature of the contractual relations between the parties, and their probative value well outweighs any prejudicial impact they might have had. The district court therefore did not

---

**7.** McCormick states: "To invoke the exclusionary rule, an actual dispute must exist, preferably some negotiations, and at least an apparent difference of view between the parties as to the validity or amount of the claim." McCORMICK ON EVIDENCE § 266, at 184 (5th ed.1999).

abuse its discretion in admitting that evidence. Finally, even if the district court should have excluded evidence of the so-called "settlement discussions," it minimized any improper influence that such evidence might have had on the jury by instructing the jury that evidence of an attempted settlement between the parties may not be considered as evidence of liability.

## H. Jury instructions

■ Advanced claims that the district court should have given three particular jury instructions, which we will consider in turn. We examine the jury instructions to determine "whether the [district court's] charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *Fisher v. Ford Motor Co.*, 224 F.3d 570, 575–76 (6th Cir.2000) (internal quotations and citations omitted). However, the district court's refusal to give a specific instruction requested by a party is reviewed for an abuse of discretion. *Id.* at 576. A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are "confusing, misleading, and prejudicial." *Roberts v. Galen of Va., Inc.*, 325 F.3d 776, 787 & n. 3 (6th Cir.2003).

First, Advanced alleges that the district court should have instructed the jury that "the state of mind or motives of a party are not material in determining whether there has been a breach of contract or the amount of damages." In support of this proposition. Advanced cites *Kewin v. Massachusetts Mutual Life Insurance Co.*, 409 Mich. 401, 295 N.W.2d 50 (1980), which held that "[i]n the commercial contract situation, unlike the tort . . . actions, the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estimation. The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith." 295 N.W.2d at 55. The district court instructed the jury as follows:

If you determine that there was a breach of contract, then you must determine the amount of damages caused by the breach. The purpose of damages for breach of contract is to provide the innocent party with the benefit of his bargain and place him in a position equivalent to that which he would have attained had the contract been performed.

Damages recoverable for breach of contract are those that may fairly and reasonably be considered as arising naturally from the breach itself or which may reasonably be supposed to have been in the contemplation of both parties when the contract was formed as a probable result of the breach.

It must be shown that the damages are the natural and proximate consequence of the breach complained of. A party must prove the amount of damages that it suffered as a result of breach with a reasonable degree of certainty as opposed to being based upon mere conjecture or speculation. However, the fact that the precise amount of damage may be difficult to ascertain does not require a party to prove the amount of its damages with mathematical precision.

We think that the charge as a whole fairly and accurately presents the applicable law to the jury. Even if the district court could have included the point of law emphasized by Advanced, namely, that bad faith does not impact damages for a contractual breach, the court was not obligated to do so as long as it presented the applicable law fairly. In fact, the court's instruction that damages must be those "fairly and reasonably be considered as

arising naturally from the breach itself" implicitly excludes from consideration any damages based purely upon bad faith.

■ Second, Advanced argues that the district court should have instructed the jury that "accounting entries in general business documents listing internal obligations are not evidence of liability." Neither party cites any law that is binding on this circuit, the Eastern District of Michigan, or the Michigan state courts, to support its respective position that accounting entries either can or cannot be used as evidence of liability. We find no abuse of discretion here.

■ Third, Advanced focuses on the fact that Doug Gibbs lied about his qualifications on his employment application and his resume; this fact was elicited on cross-examination and thereby made known to the jury during the course of the trial. Because of Gibbs's misrepresentations, Advanced urged the district court to instruct the jury that "evidence of employee misconduct, including false statements on an employment application or resume, are relevant to the issue of damages," even if Advanced did not discover the fraud until after the lawsuit. The district court instead gave the following instructions: "Every contract includes an implied promise of good faith and fair dealing requiring that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract."

Advanced relies upon two Michigan cases–*Smith v. Union Charter Twp.*, 227 Mich.App. 358, 575 N.W.2d 290 (1997), and *Wright v. Restaurant Concept*, 210 Mich. App. 105, 532 N.W.2d 889 (1995)–which hold that, in the context of employees suing a company for damages based upon racial discrimination, the damages paid to the employees can be limited if the employees had lied on their employment ap-

plications, even if the employer does not discover that fact until the discovery phase of the discrimination lawsuit. In those cases, making false statements on an employment application was grounds for immediate termination.

In the case before us, even though false statements made on an employment application are relevant to damages, it is not apparent that the cited cases are applicable in this context. As an initial matter, Doug Gibbs's submission of a resume containing false information during the due diligence process is not grounds for termination under his Employment Agreement, and even if it were. Advanced does not make such an argument. The employment relationship between Advanced and Doug Gibbs was governed by an Employment Agreement that allowed Advanced to terminate him at any time for cause, with cause being defined as "conviction ... of a crime involving moral turpitude or a crime providing for a term of imprisonment ... or [Gibbs's] willful misconduct (defined for purposes hereof as an intentional act or omission which a reasonable person would deem to be detrimental to the best interests of the Company ...)." We think that the existence of a carefully defined contract governing the relationship between Doug Gibbs and Advanced that does not provide for his termination due to misrepresentation about his resume and the fact that his cause of action at trial was based entirely upon that contract distinguish this case from the racial discrimination cases cited by Advanced.

Moreover, the jury was not barred from considering the fraud as evidence in this case; it was not incumbent upon the district court to remind the jurors of what they could and could not consider so long as the court's instructions accurately described the applicable law. We do not think that the district court abused its

discretion by failing to remind the jurors that Gibbs's misrepresentations could have a bearing on the damages he could recover.

## I. Advanced's fraud claims

■ In its complaint, Advanced alleges fraud based upon the Gibbses' material misrepresentation about "their own knowledge and experience, [as well as] the business and assets of Sport Rack." Specifically, Advanced claims that the Gibbses' descriptions of their own skills and the assets of Sport Rack were false, and that the documents furnished Advanced in the pre-sale negotiations contained "omissions of material information." The district court granted the Gibbses' motion for summary judgment on the fraud claim, holding that some alleged misrepresentations were merely conjecture as to future events, and noting that while

> Advanced lists a number of misrepresentations, it does not discuss why the representations are fraudulent, nor does it supply evidence that the representations are false, other than the testimony of Advanced CEO Marshall Gladchun. who merely identifies the representations that he *believes* must be false because the Gibbses apparently failed to live up to his expectations.

We review de novo the district court's grant of summary judgment. *Ullmo v. Gilmour Acad.,* 273 F.3d 671, 676 (6th Cir.2001). The parties agree that the elements of fraud are set forth in *Hi–Way Motor Co. v. International Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813 (1976).

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any

knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

*Id.* at 816 (citations and internal quotations omitted). Moreover, "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Id.* at 816. When there exists privity of contract between the alleged misrepresenter and the allegedly duped party, the "innocent misrepresentation rule" abolishes the requirements that the alleged misrepresenter know that his misrepresentation is false, and that the opposing party prove reliance. *United States Fidelity & Guaranty Co. v. Black,* 412 Mich. 99, 313 N.W.2d 77, 85 (1981). Finally, when a party makes representations upon which the other party, with the first party's knowledge, relies, and the truthfulness of those representations changes, the first party has a duty to disclose the change in circumstances to the latter party so as to avoid being guilty of fraudulent concealment. *Id.* at 88–89.

Given that many of the allegations of falsehood regarding the Gibbses' statements to Advanced prior to the sale of SRS concern material from SRS's business plans and projections, it is important to understand the role that such projections play in the legal context of establishing fraud. Simply put, misrepresentations of *existing* facts of a business constitute fraud, *Paquin v. Van Houtum,* 343 Mich. 111, 72 N.W.2d 169, 176 (1955), but opinions or statements about the future pros-

pects of a business (such as those a salesman might make) are not actionable. *Van Tassel v. McDonald Corp.*, 159 Mich.App. 745, 407 N.W.2d 6, 8 (1987). So, a statement about the prospects of a business that turns out to be false is not actionable in and of itself, although such a statement might be actionable if combined with a misrepresentation of existing fact or past performance upon which the rosy prediction is based. *See Mesh v. Citrin*, 299 Mich. 527, 300 N.W. 870, 873 (1941); *Martin v. Veana Food Co.*, 153 Mich. 282, 116 N.W. 978 (1908).

In its briefs, Advanced points primarily to the testimony of Marshall Gladchun to "establish[ ] that the Gibbs' description of their own skills and of Sport Rack's business and assets were false." First, Gladchun complains that Doug Gibbs told him that a certain SRS product–the top-wing ski carrier–was OEM quality, and it was not. The problems with the ski carrier were, in fact, a subject of negotiation and incorporated into the Purchase Agreement via an amendment to the Agreement which apportioned any liability "arising from the defective top wing ski carriers." From Gladchun's testimony,[8] there is no indication that Gibbs knew, when making the representation as to the ski carrier's OEM quality, that it was false. Moreover, any representation as to quality is clearly superseded by the knowledge possessed by both parties regarding the ski carrier at the time the Purchase Agreement was executed and amended. "[F]raud is not perpetrated upon one who has full knowledge to the contrary of a representation."

*Montgomery Ward & Co. v. Williams*, 330 Mich. 275, 47 N.W.2d 607, 611 (1951).

Second, Gladchun got the "impression" that he was misled by Andy Gibbs regarding Gibbs's relationships with customers, particularly those developed through two manufacturer's representatives. However, Gibbs had expressly told Gladchun that one of the two representatives was planning to join SRS *after* the company acquired enough funding. Moreover, given that Advanced required SRS to terminate its relationships with any manufacturer's reps once Advanced took over, Gladchun cannot now complain that he was misled because the second manufacturer's rep never joined SRS. Gladchun admits that SRS's lack of a relationship with the two manufacturer's reps "did not dissuade [him] from engaging or acquiring Sport Rack Systems."

Third, Gladchun "got the impression" from Andy Gibbs that the latter "had spent a significant amount of time with customers and had established relationships to provide him the information to build his business plan; and as it turned out, I found that not to be the case." In his deposition. Gladchun also parses through a report or prospectus of SRS and lists, without corroborating detail. what he believes to be misrepresentations in that document. Neither Advanced nor Gladchun have offered any further evidence on these claims such that they could survive summary judgment.

Fourth, Gladchun asserts that Andy Gibbs fraudulently misrepresented his

---

**8.** Q: [Y]ou now take the position that when [Gibbs] made the representation that [the ski carrier] was OEM quality, that was a misrepresentation?

 A: Yes.

 Q: And the only way you conclude that he intentionally misrepresented is by the events that occurred later?

 A: Yes.

 Q: Nothing else?

 A: The events that occurred later, yes.

 Q: Later?

 A: Yes.

management skills because he was unable to manage the sales force to reach PDG's goals. This complaint is based upon PDG's failure to meet projections, and is not actionable.

The Gibbses point out that "[t]here is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization is circumscribed in no respect by defendant." *Schuler v. American Motors Sales Corp.,* 39 Mich.App. 276, 197 N.W.2d 493, 495 (1972); *see also Nieves v. Bell Indus.,* 204 Mich.App. 459, 517 N.W.2d 235, 238 (1994); *Webb v. First of Michigan Corp.,* 195 Mich.App. 470, 491 N.W.2d 851, 853 (1992) (citing *Schuler*). While not dispositive in this case, we note that Advanced conducted due diligence on SRS for approximately six months before purchasing that company, a fact that further weakens Advanced's attempt to prove that it was misled in entering into the Purchase and Employment Agreements with the Gibbses. We therefore affirm the grant of summary judgment in favor of the Gibbses on Advanced's fraud claims.

## J. The Gibbses' tort claims

█ The Gibbses argue that the district court erred in dismissing on summary judgment their claims of intentional infliction of emotional distress, conspiracy, and abuse of process. We will address the three claims in turn.

First, the Gibbses claim that Advanced attempted to "cripple the[m] financially, threaten them with permanent financial ruin, and force them to surrender their company, patents, products and compensation" by terminating their pay but retaining them as employees–thereby keeping in place contractual restrictions on their employment options–and then suing them even after Advanced's officers had discussed buying out their "firm" contracts. These actions, allege the Gibbses, constitute the intentional infliction of emotional distress, and warrant a trial on the issue.

The tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

*Haverbush v. Powelson,* 217 Mich.App. 228, 551 N.W.2d 206, 209 (1996) (internal citations omitted). The district court found that Advanced's behavior did "not rise to the level of 'extreme and outrageous conduct' that is 'atrocious and utterly intolerable in a civilized community,'" and we agree. Advanced's conduct in this instance was not tortious, it was simply in breach of the contract. To plead a tort claim, the Gibbses must "allege violation[s] of an independent legal duty distinct from the duties arising out of the contractual relationship." *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.,* 454 Mich. 65, 559 N.W.2d 647, 658 (1997). The district court correctly concluded that the Gibbses failed to do so.

█ Second, the Gibbses claim that Advanced officers Gladchun and Borghi, and Hoffman, an agent of the venture capital group that eventually purchased Advanced from Masco Tech, conspired to deprive the Gibbses of compensation in violation of Michigan's Wage and Fringe Benefits Act, Mich. Comp. Laws §§ 408.471 *et seq.* Instead of buying out the Gibbses' contracts, as Hoffman had suggested, Gladchun said that he would "deal" with the Gibbses after the sale of Advanced.

Civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means. The agreement, or preconceived plan, to do the unlawful act is the thing which must be proved. Direct proof of agreement is not required, however, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact.

*Temborius v. Slatkin,* 157 Mich.App. 587, 403 N.W.2d 821, 827–28 (1986).

Noting that a conspiracy requires more than one conspirator, and that a corporation cannot conspire with itself, the district court found that the Gibbses neither mentioned the venture capital group or Hoffman in their complaint, nor presented any evidence that Hoffman was involved in the conspiracy. Therefore, the only remaining conspirators for the court to consider were Gladchun and Borghi, who, as agents of Advanced, comprised a single corporate entity, which, as the district court correctly concluded, could not conspire with itself.

The Gibbses, however, argue that "a joint action may be maintained against the conspirators for the damages caused by their wrongful acts, but all the conspirators need not be joined; an action may be maintained against but one." *Brown v. Brown,* 338 Mich. 492, 61 N.W.2d 656, 662 (1953) (internal quotations and citations omitted). Regardless of whether the failure to mention Hoffman and the venture capital group in the complaint (even if those parties are not joined as defendants) is fatal to the Gibbses' claim, the district court can be upheld on another grounds. Mich. Comp. Laws § 408.485, upon which the Gibbses predicate their conspiracy claim, provides as follows: "An employer who, with intent to defraud, fails to make payment of the wages and fringe benefits due an employee as provided in this act, is guilty of a misdemeanor." There is no evidence that Advanced stopped paying wages to the Gibbses *with any intent to defraud;* the relations between the two parties had certainly soured, but a breach of an employment contract is not a criminal act. No predicate offense exists upon which a charge of conspiracy could be based.

Third, the Gibbses claim that Advanced abused legal process by threatening to send a copy of its legal complaint against the Gibbses to the mortgage companies which had mailed employment verification inquiries regarding the Gibbses to Advanced. Ultimately, Advanced did not respond to the banks' requests for employment verification. The elements of an abuse of process claim are (1) an ulterior motive, and (2) an act by the defendant which is improper in the regular prosecution of the proceeding. *Meehan v. Michigan Bell Tel. Co.,* 174 Mich.App. 538, 436 N.W.2d 711, 727 (1989). The district court correctly found that "[t]he Gibbses have not alleged facts that suggest that Advanced improperly affected or abused process after it had been issued."

## III

For the foregoing reasons, we RE-MAND this case to the district court for a final determination of damages consistent with the instructions herein. On all other issues, we AFFIRM the judgment of the district court.